UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA DEES; L.G., a minor, and G.G., a minor, by and through their Guardian ad Litem, Robert Schiebelhut,<br><br>                                      Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY; CAITLIN McCANN; SRISUDA WALSH; GLORIA ESCAMILLA-HUIDOR; COREY KISSEL; NORMA RINCON; ALBERTO BORBOA, and DOES 4 through 100, inclusive,<br><br>                                      Defendants. | Case No.: 3:14-cv-0189-BEN-DHB<br><br>**ORDER GRANTING MOTION FOR JUDGMENT AS A MATTER OF LAW** |

       In February 2013, Defendant Caitlin McCann ("McCann"), a social worker for Defendant County of San Diego, Health and Human Services Agency (the "County"), investigated the Dees family regarding allegations of child sexual abuse.  After interviewing the parents and children, the investigation was closed as unfounded.  Subsequently, Sara Dees and her two minor children, L.G. and G.G., sued McCann and the County for violations of their constitutional rights during the investigation.  The case

was tried before a jury from February 7, 2017 to February 13, 2017. The jury returned a verdict in favor of Defendants on all claims.

Plaintiffs now move for judgment as a matter of law on their *Monell* claim against the County. They contend that McCann conducted an unconstitutional interview of L at her school pursuant to the County's policy and practice that permits children to be interviewed at school at any time without parental consent, exigency, or court order, as long as a child abuse investigation is open. Plaintiffs ask the Court to overturn the jury's verdict and order a new trial on the question of damages. Alternatively, they request the Court order a new trial as to liability. (Mot., ECF No. 151). The County opposes the motion. (Opp'n, ECF No. 158).

This case requires the Court to carefully consider competing interests in two extremely sensitive subjects. On the one hand, the crime of child sexual abuse is heinous and "society has a compelling interest in protecting its most vulnerable members from abuse within their home." *Greene v. Camreta*, 588 F.3d 1011, 1015 (9th Cir. 2009), *vacated in part as moot by* 563 U.S. 692 (2011). On the other hand, the mere accusation of an alleged crime "does not provide cause for the state to ignore the rights of the accused or any other parties." *Wallis v. Spencer*, 202 F.3d 1126, 1130 (9th Cir. 2000). Parents have an "exceedingly strong interest" in raising their children as they see fit and protecting both themselves and their children from intrusive, embarrassing government investigations. *Greene*, 588 F.3d at 1016. Here, the Court's task is delicate because not only must it resolve this conflict, it also must decide whether to disturb the collective judgment of the jury. With these considerations in mind, the Court has reviewed the record and the law. The Court concludes that the jury's verdict on the *Monell* claim was in error and grants Plaintiffs judgment as a matter of law.

/ / /
/ / /
/ / /
/ / /

# BACKGROUND[1]

Plaintiff Sara Dees is married to Robert Dees. Sara has two children from a prior marriage to Mr. Alfredo Gil, Plaintiffs L.G. and G.G. At the time of the events that are the subject of this action, L was nine years old and suffered from anxiety and ADHD. Because of these disorders, changes to L's routine could "set her off" and cause her to "melt down." Subsequent to the events at issue, L's psychiatrist has suggested that L may have autism spectrum disorder. G was five years old at the time. Robert also has two children from a prior marriage to Ms. Kelly Hunter, Ka. and Ky. Sara, Robert, and the four children all resided together.

On Thursday, February 7, 2013, Ms. Hunter called the hotline for Child Welfare Services, a division of the County's Health and Human Services Agency, to report that Robert had taken naked photos of their daughter, Ka. Ms. Hunter explained that the photographs were taken at Ka.'s request because she wanted to document her body as it changed during puberty. Ms. Hunter informed the hotline representative that Ka. lived with her father in a blended household with Sara and her biological children. Child Welfare Services generated two referrals: one for Ka. and Ky. and a companion referral for L and G.

McCann was assigned to investigate the referrals. That day, McCann interviewed the four children living in the Dees home. Ka. explained that she asked her dad to photographically document her changing body. She did not feel uncomfortable in any way, and she thought she and her father had a healthy relationship. The three other children all said that they had never been inappropriately photographed and did not know of any inappropriate photographs of anyone else. The interviews of L and G occurred at

---

[1] Both parties move to seal trial transcripts and trial exhibits. (ECF Nos. 150, 159). The parties do not contend that they sought to seal these materials during trial. Rather, the information in the documents became part of the public record during trial. As such, the parties have waived the issue. The motions to seal are **DENIED.**

home in their bedrooms with the door open.  Sara had consented to the interviews but was not present during them.

McCann continued the investigation for the next few weeks, but she did not learn anything indicating that the children were being abused or neglected.  McCann interviewed other family members and family members' therapists.  Ka. also submitted herself for a forensic interview.

On or about February 11, 2013, the Family Court ordered Robert Dees to live outside of the home during the investigation.  However, on or about February 13, 2013, the Family Court decided against making changes to the custody of the Gil children, leaving primary physical custody of L and G with Sara.  McCann's supervisor, Srisuda Walsh, learned about the Family Court's custody order sometime around February 13.  She subsequently instructed McCann to close her investigation.

At some point, the San Diego Police Department ("SDPD") opened a companion investigation.  But on February 21, 2013, McCann spoke with the investigating SDPD detective, who informed McCann that the SDPD and District Attorney would not be pursuing a case.

That should have been the end.  It was not.

On February 25, 2013, McCann interviewed L's teacher.  According to McCann, nothing in the interview raised any concerns.  The teacher explained that L has behavioral problems and appears very needy, but is smart and quick with her work.  McCann testified that at the end of the day on February 25, 2013, she had no information to lead her to believe that the children were in any danger.

Yet, on February 26, 2013, McCann went to L and G's school to interview them.  Ostensibly, McCann decided to interview L and G because she wanted to "wrap up [her] investigation . . . , make sure that [the children] were okay, and . . . get out of their lives." (2/9/17 Trial Tr. at 230:6-10).  She also said she wanted to ensure that Robert Dees was not living in the home.

///

This time, McCann neither asked, nor received, Sara's or Mr. Gil's consent to talk to the children. She admitted that four days earlier, on February 22, 2013, she had spoken to the children's grandmother to ask whether she could interview them. The grandmother said that McCann could only speak with the children in the presence of an attorney. She informed McCann that she intended to tell Sara about the conversation. Despite this notice from the grandmother, McCann conducted the unconsented interview because "per [the County's] policy, [she] can interview kids at school." (2/9/17 Trial Tr. at 230:17-18, 232:7-11; *see also* 2/8/17 Trial Tr. at 144:4-5).

The County's written policy provides that "[Child Welfare Services social workers ("SWs")] are authorized to interview a suspected victim of child abuse during school hours and to conduct the interview on school grounds." (Pls.' Ex. 3, County's Policy). The policy states:

> A SW may interview a child who may be a victim of abuse or neglect without a parent's consent. (This may include other children in the referred family since they may be potential victims.) However, a child who is **not** an alleged victim or member of the referred family **cannot** be interviewed without a parent's consent.

(*Id.* (emphasis in original)).

The policy requires the social worker to comply with certain procedures during the interview:

> The SW will:
> - Advise the child of the right to have school personnel present during the interview
> - Advise the child that (s)he may stop the interview at any time and periodically check with the child during the interview to determine if (s)he is comfortable with continuing the interview. If the child says stop, then the SW will immediately terminate the interview
> - Not include law enforcement in the interview
> - Complete the interview within developmentally-appropriate time limits, which will never exceed 60 minutes.

(*Id.*) Leesa Rosenberg, who testified as the person most knowledgeable about the County's policies regarding interviews of children during child abuse investigations,

characterized these procedures as safeguards to protect the child's rights. The policy does not advise the child that he or she may decline to be interviewed. Nor does the policy include any guidance about when to inform a parent about the interview. Rosenberg stated that, at the time of the events at issue, the County's policies allowed a social worker to interview a child at school without the knowledge and consent of a parent and without a court order.

Similarly, Walsh testified that it was the practice of the County's social workers to interview children at school even if the children were not in imminent danger and without parental consent, as long as the social worker had an open investigation. McCann confirmed this practice.

When McCann arrived at the school, L was called out of class and brought to the school's administrative office to speak with McCann. McCann testified that when she introduces herself to children, she tries to be "friendly and nice." McCann asked L if she was willing to speak with McCann, and L replied affirmatively. McCann also asked L if she wanted anyone present, and L said no. McCann informed L that she could end the interview at any time and that she could ask any questions. McCann interviewed L in an unoccupied office in the school's front office area. McCann described L as appearing "fine" and "not . . . upset at all." (2/8/17 Trial Tr. at 147:7-8; 2/9/17 Trial Tr. at 232:14-15).

McCann asked L how she was doing. L "was brief when speaking to" McCann. (Pls.' Ex. 2, McCann's Delivered Service Log). L said that since the last time she saw McCann, "things have gotten worse" because "[redacted] can't stay home unless their grandmother is home, and they have to go everywhere with her." (*Id.*) When asked if she likes her grandmother, L responded that "she's ok." (*Id.*) McCann also asked about Robert Dees and the photographs. L told McCann that Robert was not living in the home. L thought it was "stupid that [Robert] can't live in his own house" and reported that Sara "doesn't like" it. (*Id.*) L "denied [that] any pictures have been taken of her or knowing about any pictures taken of anyone else in her home." (*Id.*)

The interview lasted approximately five minutes. L did not "get up and walk away from [McCann] in the middle of a[ny] question[s]." (2/9/17 Trial Tr. at 236:19-21). McCann testified that the interview ended "naturally" as "there were no other questions [she] had," and she told L that L could return to class. (2/9/17 Trial Tr. at 236:13-15). She admitted, "I guess [it] would be that I ended the interview." (2/9/17 Trial Tr. at 236-15-16). McCann testified that L did not seem upset.

Ironically, Sara testified that she was volunteering in G's classroom that day. She saw L come "screaming down the hallway," yelling "CPS is here, CPS is here." L told Sara that "CPS wants to talk to [G] right now. Hurry, hurry." (2/8/17 Trial Tr. at 222:23-223:1-5). L asked her mother if McCann was there "to take" her. (2/8/17 Trial Tr. at 237:19-20). Sara walked with L and G to the school's front office. She testified that L appeared upset, was hyperventilating, and was running around the front office.

McCann eventually closed her investigation on March 7, 2013, approximately three weeks after Walsh had told her to close it. All the allegations were determined to be unfounded.

At trial, Plaintiffs moved for judgment as a matter of law at the close of evidence, which the Court took under submission. On February 13, 2017, the jury found in Defendants' favor on all claims. Specifically, the jury concluded that McCann did not violate the Fourth Amendment rights of L or the Fourteenth Amendment rights of Sara when she conducted the school interview. (Verdict Form 2, ECF No. 144). Because the jury did not find a constitutional violation, it did not consider whether McCann acted pursuant to an official County policy or practice and whether that policy or practice was the cause of the violation. (*Id.*)

///
///
///
///
///

# LEGAL STANDARDS

## I. Legal Standard for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure Rule 50, a court may enter judgment as a matter of law once "a party has been fully heard on an issue" and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, the jury verdict should be overturned and judgment as a matter of law entered "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.*

In evaluating a motion for judgment as a matter of law, a court does not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Instead, the court "must draw all reasonable inferences in favor of the nonmoving party." *Id.* "That is, the court should give credence to the evidence favoring the nonmovant as well as 'that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (internal citation omitted).

## II. Legal Standard for a New Trial

Under Federal Rule of Civil Procedure 59(a), a new trial may be granted on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," the court is bound by historically recognized grounds. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). These include verdicts against the weight of the evidence, damages

1  that are excessive, and trials that were not fair to the moving party. *Molski v. M.J. Cable,*
2  *Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *see also Passantino v. Johnson & Johnson*
3  *Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000) ("The trial court may grant a
4  new trial only if the verdict is contrary to the clear weight of the evidence, is based upon
5  false or perjurious evidence, or to prevent a miscarriage of justice.").
6    Although the Court may weigh the evidence and assess the credibility of witnesses
7  when ruling on a Rule 59(a) motion, it may not grant a new trial "merely because it might
8  have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am.,*
9  *Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted); *see also*
10 *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) ("It is
11 not the courts' place to substitute our evaluations for those of the jurors."). A court will
12 not approve a miscarriage of justice, but "a decent respect for the collective wisdom of
13 the jury, and for the function entrusted to it in our system, certainly suggests that in most
14 cases the judge should accept the findings of the jury, regardless of his own doubts in the
15 matter." *Landes Constr. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir.
16 1987) (citations omitted).

## DISCUSSION

18   Local government entities, like the County, can be held directly liable for
19 constitutional violations under 42 U.S.C. § 1983 if a policy, custom, or practice of the
20 entity is shown to be the moving force behind the constitutional violation. *Monell v.*
21 *Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978). Plaintiffs brought such a claim
22 based on the County's school interview policy, but the jury did not find in their favor. In
23 the instant motion, Plaintiffs argue there was no legally sufficient evidentiary basis for
24 the jury to find for the County on the *Monell* claim. They ask the Court to enter
25 judgment as a matter of law on the *Monell* claim and to order a new trial on the question
26 of damages. In the alternative, they argue that the verdict is against the clear weight of
27 evidence and request a new trial as to liability.
28 / / /

Plaintiffs' *Monell* claim requires proof that: (1) McCann acted under color of state law; (2) McCann's acts deprived L of her Fourth Amendment rights and Sara of her Fourteenth Amendment rights; (3) McCann acted pursuant to an expressly adopted official policy or longstanding practice of the County; and (4) the County's official policy or longstanding practice caused the deprivation of L's and Sara's rights. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The parties agree that McCann acted under color of state law. (Joint Jury Instructions, ECF No. 127; Jury Instruction No. 13, ECF No. 147). Thus, to prevail on their motion, Plaintiffs must show that the evidence, construed in the light most favorable to the County, satisfies the remaining elements and warrants only one conclusion: that McCann violated L's Fourth Amendment rights and Sara's Fourteenth Amendment rights by conducting the school interview and the County's policy or practice caused that violation. The Court considers each element in turn.

**A. Deprivation of Constitutional Rights**

"Two provisions of the Constitution protect the parent-child relationship from unwanted interference by the state: the Fourth and Fourteenth Amendments." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016). For a child, the Fourth Amendment protects the child's right to be free from an unreasonable seizure of his or her person. U.S. Const. amend. IV. For a parent, the Fourteenth Amendment safeguards a parent's right to make decisions about the care, custody, and control of his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). In this case, substantial evidence does not support the jury's verdict that no constitutional violation occurred. Instead, the evidence supports only one conclusion: that McCann violated L's Fourth Amendment rights and Sara's Fourteenth Amendment rights.

1. <u>Violation of L's Fourth Amendment Rights</u>

To succeed on L's Fourth Amendment claim, Plaintiffs must show that a seizure occurred and that the seizure was unreasonable. A seizure occurs when, in light of all the circumstances, a reasonable person would have believed that he or she was not free to

1  leave. *Jones v. Cnty. of Los Angeles*, 802 F.3d 990, 1000-01 (9th Cir. 2015) (citing
2  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The Ninth Circuit has
3  identified five [nonexclusive] factors that aid in determining whether a person's liberty
4  has been so restrained." *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009).
5  Those factors are (1) the number of officers present, (2) whether weapons were
6  displayed, (3) whether the encounter occurred in a public or non-public setting, (4)
7  whether the officer's authoritative manner would imply that compliance would be
8  compelled, and (4) whether the officers advised the detainee of his right to terminate the
9  encounter. *Id.* These factors do not fit neatly into the context of a child interviewed by a
10 social worker during a child abuse investigation. Because whether a seizure occurs
11 depends on the totality of circumstances, the Court also considers L's age, education,
12 mental development, and familiarity with the interview process. *Cf. Aguilera v. Baca*,
13 510 F.3d 1161, 1169-70 (9th Cir. 2007) (considering factors tailored to the context of the
14 alleged seizure).

15       L is a young child with known behavioral disorders. She was taken out of class by
16 school officials. She was not taken to the playground or the cafeteria to talk. She was
17 not sent to a comfortable or familiar place. Instead, L was brought to an unoccupied
18 office in her school's administrative office area to speak alone with McCann. Police
19 officers were not present. McCann advised L that she could stop the interview at any
20 time, but she did not inform L that she could decline to be interviewed.

21       L was wary of McCann after her first interview. L knew that McCann had the
22 power to disrupt her life. L understood that McCann had caused her step-father to move
23 out of the house. Indeed, L told McCann that "things have gotten worse" since the last
24 time she spoke to McCann. While the interview may have lasted only five minutes,
25 McCann asked L about intimate details of her family life. The two discussed where
26 Robert Dees was living, what her mother thought about Robert being out of the home,
27 and whether inappropriate photographs had been taken. L "was brief" in answering
28 McCann.

1    L did not end the interview on her own.  Instead, the interview ended "naturally,"
2  according to McCann, when she finished asking questions.  McCann testified that L did
3  not seem upset, but the circumstances show that L was upset by the interview.  After the
4  interview, L ran down the school hallway to find her mother and asked her mother
5  whether McCann was there to "take" her.
6    Under these circumstances, the Court finds that the only reasonable conclusion is
7  that McCann seized L.  A reasonable nine-year-old child who is called out of class by
8  school officials for the purpose of meeting with a social worker who has already
9  disturbed the child's family life, and who is not advised that she may refuse to speak with
10 the social worker, will feel compelled to talk to the social worker and remain there until
11 dismissed.  Other courts have found that similar circumstances constitute a seizure.  *See*
12 *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (holding that 20-minute interview of
13 eleven-year-old boy was a seizure where the child was escorted from class by the
14 principal, caseworkers, and a uniformed police officer into church's empty nursery and
15 questioned by the caseworkers, with the police officer present, about whether the
16 principal or his parents had spanked him); *Greene*, 588 F.3d at 1022 (concluding that
17 nine-year-old girl was seized where taken out of class and interviewed in a private office
18 for two hours by a social worker in the presence of a uniformed police officer, even
19 though the child "did not ask to call home, did not ask to have a [school counselor] or her
20 parents with her, and did not cry"); *cf. Stoot v. City of Everett*, 582 F.3d 910, 918 (9th
21 Cir. 2009) (holding that two-hour school interview of 14-year-old boy during which
22 police detective threatened punishment if the child denied guilt and promised leniency if
23 he admitted guilt constituted a seizure); *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir.
24 2005) (holding that an "emotionally vulnerable" 16-year-old female was seized where a
25 social worker and uniformed police officer, both of whom the teenager knew "had the
26 authority to determine her custodial care," confined her for an "hour or two" in a small
27 office at her school and repeatedly threatened that they would arrest her if she did not
28 agree to live with her father).

1    The next question is whether the seizure was reasonable.  Neither the Supreme
2 Court nor the Ninth Circuit has decided what reasonableness standard applies to seizures
3 of children at school during child abuse investigations.  Both parties recognize that the
4 standard is neither settled nor decided.  Plaintiffs argue that McCann needed a warrant,
5 court order, or one of the traditional exceptions to the warrant requirement to justify the
6 seizure.  They further contend that the seizure was not reasonable even under the lesser
7 standard of reasonableness applicable to cases concerning searches and seizures on
8 school grounds by school officials for the purposes of maintaining discipline.  That
9 standard, outlined in *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985), requires only that
10 the search or seizure be reasonable under all the circumstances.  The County, while
11 arguing that *T.L.O.* is not applicable, simultaneously advocates for a general
12 reasonableness standard.

13    In *Greene v. Camreta*, the Ninth Circuit applied the traditional Fourth Amendment
14 protections to a social worker's in-school interview of a suspected child abuse victim
15 during a child abuse investigation.  The court reasoned that "law enforcement personnel
16 and purposes were too deeply involved in the seizure . . . to justify applying the" *T.L.O.*
17 standard.  *Greene*, 588 F.3d at 1027.  The interview at issue was motivated by law
18 enforcement purposes, not by the need for school-related discipline.  Against this
19 backdrop, the Ninth Circuit held that the seizure of a nine-year-old child "in the absence
20 of a warrant, a court order, exigent circumstances, or parental consent was
21 unconstitutional." *Id.* at 1030.  The Supreme Court eventually vacated this portion of the
22 Ninth Circuit's opinion as moot because the suspected victim had reached the age of
23 majority and moved out of the state, meaning that "she [was] no longer in need of any
24 protection from the challenged practice." *Camreta v. Greene*, 563 U.S. 692, 711 (2011).
25 The Supreme Court did not disapprove of the Ninth Circuit's reasoning.

26    This Court finds that *Greene* remains persuasive.  Like the social worker in
27 *Greene*, McCann was acting as a law enforcement officer when she arrived at the school
28 to interview L.  She pursued the interview to ensure Robert Dees was out of the home and

to check, once again, on the children before she closed her investigation. Had she learned about any abuse, she would have been required to report that abuse and notify the police, and she could have removed L from her parents' custody. *See* Cal. Penal Code § 11165.7 (defining a "mandated reporter" to include a social workers), § 11166 (explaining obligations of a mandated reporter and police notification requirement); Cal. Welf. & Inst. Code § 306 (describing powers of social worker). The interview was not undertaken by school officials for the purposes of maintaining order in the school. As the Ninth Circuit explained in *Greene*, under such circumstances, the traditional procedural protections of the Fourth Amendments are required. *See Greene*, 588 F.3d at 1024-30.

Thus, McCann needed a warrant, court order, parental consent, exigency, or at the very least, reasonable suspicion to seize and interview L. She had none of these. The County admits that McCann did not have a warrant, court order, consent, or exigent circumstances. (Opp'n at 11-12). Nor did she have reasonable suspicion that L was the subject of child abuse and neglect. *See Terry v. Ohio*, 392 U.S. 1, 19-27 (1968) (holding that an officer's reasonable suspicion of criminal activity may justify a brief investigatory detention).[2] McCann testified that on the day of the interview, she had no information to lead her to believe that the children were in any danger. (2/8/17 Trial Tr. at 143:7-13). The police had ended their investigation, and McCann's supervisor had told her to "wrap . . . up and close" her investigation two weeks earlier. (2/8/17 Trial Tr. at 54:5-7; Pls.' Ex. 2). Drawing all inferences in the County's favor, the only reasonable conclusion from this evidence is that there were no exigencies and McCann had neither reasonable suspicion nor parental consent at the time of the interview. Therefore, because McCann

---

[2] *Greene* did not consider whether reasonable suspicion could justify a seizure of a suspected child abuse victim in a child abuse investigation. The Court assumes, without deciding, that a seizure could be reasonable if the social worker had reasonable suspicion that the child was the victim of child abuse and neglect.

lacked a warrant, court order, parental consent, exigency, or reasonable suspicion, she conducted the school interview in violation of L's Fourth Amendment rights.

### 2. Violation of Sara's Fourteenth Amendment Rights

The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. XIV, § 1. Parents have a well-established liberty interest in the "companionship, care, custody and management of [their] children." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) (explaining that the constitutionally protected liberty interest includes the right to "establish a home and bring up children" and "to control the education of their own"). The right to familial relations is not, however, absolute. A parent's rights are limited by the government's compelling interest in protecting a minor child. *See Wallis*, 202 F.3d at 1138. For instance, the "right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993) (citing *Stanley v. Illinois*, 405 U.S. 645, 649 (1972)). Official conduct must "shock the conscience" to be a Fourteenth Amendment violation. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). A social worker's conduct shocks the conscience when he or she acts with "deliberate indifference," which means "conscious or reckless disregard of the consequences of one's acts or omissions." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

Here, the only reasonable conclusion from the evidence is that McCann unconstitutionally interfered with Sara's familial rights. Sara had a right to raise her child as she saw fit, which included a right to protect her child from being seized without the procedural protections of the Fourth Amendment. *See Doe*, 327 F.3d at 524 (holding that "because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his

parents"). McCann interfered with Sara's rights by conducting the interview in the absence of a warrant, court order, parental consent, exigency, or reasonable suspicion.

Sara's rights were not limited by the government's interest in protecting L. In fact, the County lacked a compelling interest at the time of L's school interview. A government "has no interest whatever in protecting children from parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger." *Wallis*, 202 F.3d at 1141 n.14. At the time of the interview, there was no reasonable evidence that Sara was unfit and that L was in any danger, much less imminent danger. Indeed, McCann admitted as such at trial. (2/8/17 Trial Tr. at 143:7-16).

McCann's actions were deliberately indifferent to Sara's rights. Prior to going to the children's school, McCann had no evidence of L or G having been abused. Her supervisor had instructed her to close the investigation. She had no evidence that either child was in imminent danger. (2/8/17 Trial Tr. at 143:7-16).

What McCann did know is that Sara would not grant consent for any further private interviews with the children. In fact, the grandmother had told her that Sara would insist on an attorney being present. (2/9/17 Trial Tr. at 230:11-16). She also knew that L was a young child with special needs and could be upset easily. (2/8/17 Trial Tr. at 200:11-20). Yet, without Sara's or Mr. Gil's consent, McCann pursued the interview because her policy allowed her to do so. (2/8/17 Trial Tr. at 143:21-144:5).

The evidence is clear that McCann purposely went to the one place she knew she could find L or G and question L or G without Sara knowing. Because of the County's policy, that place was the children's school. Ironically, had McCann not been indifferent to Sara's rights, she could have asked for consent from Sara right there at the school. McCann was deliberately indifferent and that shocks the conscience. Her conduct need not be "for the very purpose of causing harm" to be shocking. *Gantt*, 717 F.3d at 708.

It is clear that "[t]he government may not, consistent with the Constitution, interpose itself between a fit parent and her children simply because of the conduct—real or imagined—of the other parent." *See Wallis*, 202 F.3d at 1142 n.14. Rather,

government social workers must comply with the procedural protections of the Fourth Amendment. That did not happen here. The record demonstrates that the only reasonable conclusion is that McCann violated L's Fourth Amendment rights and Sara's Fourteenth Amendment rights during the school interview.

### B. Action Pursuant to the County's Policy or Practice

The jury did not decide whether McCann acted pursuant to an official policy or longstanding practice of the County of San Diego. In this case, the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, the only conclusion that reasonable jurors could have reached is that this element is satisfied. Indeed, it does not appear that the County contests this element.

The evidence demonstrates that the County had an official policy and longstanding practice of permitting social workers to interview suspected victims of child abuse, including children in the referred family, at school without parental consent or notification, exigency, reasonable suspicion, court order, or warrant, as long as the social worker had an open investigation. The County's official policy expressly permitted social workers to interview children in the referred family at school without any limitations. (Pls.' Ex. 3). According to the County policy, an interview may proceed even without the consent of the parent who is not suspected of abuse or does not live with one suspected of abuse. An interview may occur even when the abuse allegations have not been substantiated, there are no new allegations, and the interview is intended to provide only "closure" to the children. The County's person most knowledgeable confirmed this policy. (2/8/17 Trial Tr. at 159:18-25). Walsh and McCann further explained that it is County social workers' practice to conduct such interviews so long as an investigation is open. (2/8/17 Trial Tr. at 56:18-57:1, 78:13-79:10, 148:25-149:6).

As for whether McCann acted pursuant to official policy and practice, there is no doubt that she did. She testified numerous times that she went to the school to conduct the interviews because the County's policy permitted her to do so. (2/8/17 Trial Tr. at
/ / /

144:3-5; 2/9/17 Trial Tr. at 230:17-18, 232:9-11).  Therefore, the only remaining question is one of causation, which the Court addresses next.

### C. The County's Policy and Practice Caused the Violation

Because the jury did not find a constitutional violation, it did not consider whether the County's policy or practice was the "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694.  To meet the causation requirement, a plaintiff must show both causation-in-fact and proximate causation. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013).  Plaintiffs argue that "[i]t was because of the County's policy that McCann believed she was authorized to conduct non-consensual interviews with the children at their school."  (Mot. at 23).  The County responds that its policy or practice did not cause the constitutional violations because the policy contains safeguards to protect people's rights, such as advising the child that he or she may have school personnel present and periodically assessing how the child is doing during the interview.  (Opp'n at 17).  The County argues that the policy's procedural safeguards did not and cannot cause a reasonable child to feel like they were not free to leave.  (*Id.* at 18).

Construing the evidence in the County's favor, and neither weighing the evidence nor witnesses' credibility, the Court finds that the County's policy and the particular injuries are cause and effect.  McCann conducted the school interview despite lacking a court order, warrant, parental consent, exigency, or reasonable suspicion *because her policy allowed her to do so*.  She admitted this multiple times at trial.  For instance:

> Q: So why didn't you ask Mrs. Dees for her permission to interview the kids at school?
> A: At that point, I have an open investigation.  I'm just trying to get out of the case.  And I – per policy, I can – I can see kids and wrap it up at school.

(2/9/17 Trial Tr. at 232:9-11; *see also* 2/8/17 Trial Tr. at 144:3-5; 2/9/17 Trial Tr. at 230:17-18).  She pursued the school interviews even though she knew that the children were not allowed to be interviewed again without an attorney present.  (2/9/17 Trial Tr. at 230:11-22).  But for the policy, McCann would not have interviewed L at school and Plaintiffs' injuries would have been avoided.

The procedural safeguards in the policy do not save it. As an initial matter, the County's person most knowledgeable acknowledged that the policy does not protect a parent's rights to custody, care, and companionship of his or her children. Rather, she explained that the procedures are designed to protect the child's rights. But the safeguards do not guarantee that a child interviewee feels free to leave. The pre-interview admonishments fail to tell the interviewee that he or she may refuse the interview. Instead, the procedures assume that the interview will occur. (*See* Pls.' Ex. 3 (the safeguards provide that the social worker must (1) advise the child of the right to have school personnel present *during the interview*; (2) advise the child that she *may stop the interview* at any time; (3) periodically check with the child *during the interview* to determine if the child is comfortable with *continuing the interview*; (4) not include law enforcement *in the interview*; and (5) *complete the interview* within appropriate time limits (emphasis added)). While a reasonable inference from these procedures is that they may help a child feel more comfortable during an interview, they do not preclude a finding that the child does not feel free to leave. If anything, these procedures induce compliance with the social worker. The safeguards do not prevent a reasonable child from feeling seized.

The County's policy and longstanding practice of permitting social workers to interview children at school in the absence of a court order, warrant, parental consent, exigency, or reasonable suspicion was the factual and proximate cause of Plaintiffs' injuries. If the policy had required any of the Fourth Amendment procedural protections, the interview would not have occurred and Plaintiffs would not be injured. But none of these conditions were present and McCann acted deliberately because the policy provides social workers with carte blanche to interview children at school during "open" investigations.

### D. The Only Reasonable Conclusion Is Contrary to the Jury's Verdict

The parties have been fully heard. The Court now finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the County on Plaintiffs'

*Monell* claim. Fed. R. Civ. P. 50(a)(1). Without considering the credibility of witnesses or otherwise weighing the evidence, and drawing all reasonable inferences in the County's favor, the only conclusion that reasonable jurors could have reached is that the County's policy and practice caused the violation of L's and Sara's constitutional rights.

## CONCLUSION

The Court **GRANTS** Plaintiffs' motion for judgment as a matter of law and sets a status hearing for **October 19, 2017** at **1:00 pm**.

Rule 50 requires that if "the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Accordingly, the Court conditionally grants the motion for a new trial because the clear weight of evidence does not support the verdict.

**IT IS SO ORDERED.**

Dated: October 10, 2017

Hon. Roger T. Benitez
United States District Judge